UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA HUNTER,                              Case No. 17-10314

     Plaintiff                              Stephanie Dawkins Davis
v.                                           United States Magistrate Judge

GENERAL MOTORS LLC,

     Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Dkt. 23)**

## I.    PROCEDURAL HISTORY

Plaintiff, Cynthia Hunter, filed a complaint in state court for race and sex

discrimination under the Michigan Elliott-Larsen Civil Rights Act and Title VII

and for retaliation under Elliott-Larsen on December 22, 2016. (Dkt. 1, Notice of

Removal, Pg ID 8-23). Defendant, General Motors LLC, removed the action to

federal court on February 1, 2017. (Dkt. 1). On January 3, 2018, the parties

executed a consent for reference of this matter to the undersigned magistrate judge.

(Dkt. 20). On January 5, 2018, District Judge Robert H. Cleland signed the

consent and referred this matter under 28 U.S.C. 636(c). (Dkt. 21). After

completing a period of discovery, GM filed its motion for summary judgment.

(Dkt. 23-25). Hunter filed her response (Dkt. 27) and GM filed a reply. (Dkt. 28).

On October 4, 2018, the parties filed their joint statement of resolved and

unresolved issues. (Dkt. 30). Pursuant to notice, the Court held a hearing on December 6, 2018. (Dkt. 29).

For the reasons set forth below, the Court **GRANTS** defendant's motion for summary judgment of plaintiff's sex-based claims. Plaintiff's race-based claims were conceded and thus, are also dismissed.[1]

## II. FACTUAL BACKGROUND

Hunter was hired at GM on March 1, 2013. (Dkt. 25-1, Plf. Dep. pp. 36, 162-63; Plf. Dep. Ex. 14). Hunter worked at GM's Warren Technical Center as a Mainframe Technical Specialist during the entirety of her employment; she was a storage administrator for GM's mainframe computer. *Id*. at 34, 39-40, 162-63; Plf. Dep. Ex. 14. GM's mainframes store GM's data and are necessary to run the business; if the mainframes do not operate, the business cannot run normally. *Id*. at 52- 53. Mainframe Storage Manager Samuel Rurka supervised Hunter. Rurka also previously worked with Hunter at Ford Motor Company, and he had

---

[1] Based on her response to the motion for summary judgment, it appeared that Hunter was no longer pursuing her claims based on race. Counsel for Hunter confirmed as much on the record at the hearing. *See e.g.*, *Briggs v. Univ. of Detroit-Mercy*, 611 Fed. Appx. 865, 870 (6th Cir. 2015) (A plaintiff who fails to address a claim in response to a motion for summary judgment is deemed to have abandoned the claim); *Hart v. Honeywell Int'l*, 2017 WL 1235000, at *3 (N.D. Ohio Apr. 4, 2017), on reconsideration in part 2017 WL 2693558 (N.D. Ohio June 21, 2017) (Claim dismissed where the plaintiffs expressly conceded that the claim should be dismissed at oral argument, and implicitly conceded as such by failing to respond to the defendant's motion summary judgment on the claim.). Thus, this Opinion and Order only addresses Hunter's claims based on sex and does not address any claims based on race. Hunter's race-based claims are, therefore, dismissed.

interviewed and hired her to work at GM. *Id*. at 30-31, 61; Dkt. 25-3, Deposition of Samuel Rurka, pp. 9-11.

As Hunter's supervisor, Rurka conducted Hunter's 2014 performance review. (Dkt. 25-1, p. 104; Plf. Dep. Ex. 6). In that review he commented, "[t]he quality and quantity of work is not what I expect in your position" and that "task[s] that had been assigned to you to be delivered by a certain date have been reported 'complete' when they actually were partially (sic) at best." *Id*. at 105-06; Plf. Dep. Ex. 6. Although Hunter believed she had completed her assignments, Rurka did not. *Id*. at 106-07. According to GM, one significant performance failure by Hunter in July 2014 resulted in dealerships in Brazil being unable to use GMAC financing for customers to purchase vehicles. Despite these performance issues, GM gave Hunter a merit raise, and she was neither demoted nor subjected to any reduction in pay. *Id*. at 109, 115; Plf. Dep. Ex. 14. Although Hunter disagreed with the review and believed it was discriminatory, she did not complain to Human Resources. *Id*. at 112-15.

In September 2014, GM's tape libraries were nearing maximum capacity; Hunter informed her group that the libraries were more than 90 percent full. *Id*. at 116-17. The issue was a serious one for the company because if the tapes reached 100 percent of capacity, GM's production of cars would stop. (Dkt. 25-7, Declaration of Samuel Rurka, ¶ 7). Rurka deemed the problem to be one that

would require maximum effort from all team members to identify and implement a solution. *Id.* He met with the team, including Hunter, to strategize on how to address the storage problem. (Dkt. 25-1, p. 117; Dkt. 25-3, pp. 19-21, 30-31). However, instead of staying at work to continue conferencing with the team to resolve this issue, Hunter left to attend a personal engagement. (Dkt. 25-1, pp. 118-19; Dkt. 25-3, p. 24; Dkt. 25-7, ¶ 9). The team members who continued meeting decided to delete certain tapes after Hunter left for her engagement. (Dkt. 25-1, pp. 125-26).

When Hunter arrived at work the next day, Rurka told her that Brent Beck, a contractor and not a GM employee, had deleted the necessary data files. (Dkt. 25-1, p. 120; Dkt. 25-3, p. 16). However, the deleted files were generational data group files ("GDGs") that should never be deleted. (Dkt. 25-1, pp. 120-25; Dkt. 25-3, pp. 19-21, 23-24). According to GM, this occurred because Hunter – the only person on the team who knew these GDGs should not be deleted – did not speak up during the meeting while her coworkers spoke about deleting them, and then left to go to her personal engagement instead of staying to assist team members in addressing the issue. (Dkt. 25-1, pp. 121-24; Dkt. 25-3, 19-21, 24-26, 30-31). Although 500 to 600 of the deleted tapes were recovered, another 20,000 deleted tapes could not be recovered and were lost forever. (Dkt. 25-1, pp. 122-24). According to GM, Hunter had approximately 20 years of experience with

mainframe computers and knew that these GDGs should not be deleted. (Dkt. 25-1, pp. 12, 18-28; Plf. Dep. Ex. 1). GM maintains that if Hunter had stayed at work with her coworkers instead of leaving work early during a crisis situation, she could have prevented their deletion. (Dkt. 25-1, pp. 121-24; Dkt. 25-3, pp. 19-21, 24-26, 30-31).

Two women, Mainframe Storage Director Jessie Bruner and HR Business Partner Kathie Vosganian, conducted an investigation regarding the deleted data. Rurka, Smith, Hunter and contractors Walt Willis and Beck were interviewed as part of the investigation. (Dkt. 25-1, pp. 126-27, 128-30, 133; Plf. Dep. Ex. 7; Dkt. 25-8, Kathie Vosganian Declaration ¶¶ 3-4; Vosganian Declaration Ex. 1). The investigation resulted in a finding that Hunter was partially responsible for the deletion. (Dkt. 25-1, pp. 124-25, 128-30, 138-39; Plf. Dep. Ex. 7). Vosganian determined that Hunter "left the premises during a very serious problem that occurred with the mainframe and left the building when it was all hands-on deck situation," and "[s]he did not share critical information she knew that could have prevented a massive data loss" because "she wasn't concerned enough about it to stay with the rest of the group and help solve the problem." (Dkt. 25-5, deposition of Kathie Vosganian ("Vosganian Dep."), pp. 22-25). Hunter maintains, however, that she explained to the entire team how GDGs worked. (Dkt. 27-7, Ex. F). She asserts there was no "crisis" and she left at the end of the workday after explaining

to everyone that the data would "fall off" on its own.  *Id*.  Hunter says that Rurka

ignored her and did not follow her suggestions.  She left work for the day due to a

prior commitment, believing that the mainframe capacity issue had been handled.

*Id*.  Hunter also points out that Rurka did not understand how the GDG's worked

or how certain files automatically "fell off" the Mainframe, and none of her team

members were disciplined for not knowing how the mainframe storage worked.

(Dkt. 27-8, Ex. G, Overview of Mainframe Data Loss; Dkt. 27-11, Ex. J, January

5, 2015 Memorandum to File - Cynthia Hunter).

Some, though not all, members of the mainframe team suffered

consequences as a result of this incident.  Specifically, Hunter and two men

received consequences.  Beck saw his contract terminated as a result of his actions.

(Dkt. 25-1, pp. 43-44, 45-46, 88-89, 124).  A second man, Rurka, received a

written memo to his file for his role in the deletion, as did Hunter.  Rurka also lost

approximately $10,000.00 in bonus money as a result and GM considered

terminating his employment.  (Dkt. 25-1, pp. 134, 138; Plf. Dep. Ex. 10; Dkt. 25-3,

pp. 22-23; Dkt. 25-5, pp. 19-20).  Though Hunter denies responsibility for the tape

deletion (Dkt. 25-1, p. 139), Bruner, a woman, determined that Hunter's leaving

work to attend to a personal function and her failure to provide critical information

regarding GDG tapes contributed to the loss of the data.  (Dkt. 25-3, pp. 19-21, 24-

26, 30-31).

GM says Bruner was prepared to end Hunter's employment for her performance failings, but Rurka and Andrzejewski talked Bruner into giving Hunter one more chance. (Dkt. 25-7, Rurka Dec. ¶ 18). GM maintains that Hunter's poor performance continued in 2015 resulting in her placement on a "last chance agreement" on October 1, 2015.[2] (Dkt. 25-1, p. 149; Plf. Dep. Ex. 12). The document GM calls a last chance agreement is entitled "Memorandum to File – Policies and Procedures Violation" and it outlines additional instances of performance issues in 2015. (Plf. Dep. Ex. 12). Specifically, in June 2015, Hunter was involved in an incident that resulted in a three-and-a-half-hour outage at four warehouses in Canada, during which employees could not pick parts to build cars. (Dkt. 25-1, pp. 143-45, 150-51; Plf. Dep. Ex. 12; Dkt. 25-3, pp. 72-74; Rurka Dep. Ex. 6). On August 4, 2015, Rurka documented to HR Business Partner Michael Andrzejewski that Hunter had made unauthorized changes, which Hunter does not dispute making. (Dkt. 25-1, pp. 147-49; Plf. Dep. Ex. 11). On September 20, 2015, according to the Memorandum to File, Hunter allowed employees to move datasets after she started a catalog reorganization, even though her group had established procedures that prohibited these moves from taking place once a

---

[2] Hunter dispute's defendant's characterization of this document as a "last chance" agreement. Hunter says the words "last chance" appear nowhere in this document and it is merely a standard disciplinary document with no significance. (Dkt. 27, p. 12). However, the language relied on by GM in the document is not contained in other disciplinary memos in the record or other papers documenting her errors. (Dkt. 25-2, Pg ID 305, Pl. Dep. Ex. 10; Dkt. 25-2, Pg ID 36-311, Pl. Dep. Ex. 11).

reorganization has begun.  (Plf. Dep. Ex. 12).  GM says that Hunter's actions

resulted in the system being one hour and 23 minutes late coming back online.

(Dkt. 25-1, pp. 150-53; Plf. Dep. Ex. 12).  The Memorandum to File, which Hunter

signed, stated that further violations "will likely result in termination of

employment."  (Plf. Dep. Ex. 12).

Hunter maintains that the incident in September 2015 was Jorge Diaz's fault

and she was unfairly blamed for his mistake.  She says Diaz interrupted her change

order and began his own change order, and that Diaz's actions were strictly

prohibited and against company policy.  (Dkt. 27-12, Ex. K, Deposition of Joseph

Gurchiek, pp.11-12).  Mr. Gurchiek advised HR that Hunter was not at fault for

this incident.  *Id.*  Yet, Hunter was still disciplined as set forth in the October 1,

2015 "last chance" agreement.  (Dkt. 27-13, Ex. L, October 1, 2015 Memo to File).

As a result, Hunter contacted a co-worker, William Neale, who conducted an

inquiry into the error rates of Hunter and her team-members.  Neale found that

Hunter had the lowest percentage of mistakes on her team.  (Dkt. 27-14, Ex. M,

deposition of William Neale, pp. 53, 56, 59; Dkt. 27-15, Ex. N, Affidavit of

William Neale).

In November 2015, GM says Hunter made another error that resulted in GM

car factories in Europe not being able to print shipping labels for cars coming off

the assembly lines; the cars were parked in a lot until labels could be printed.

(Dkt. 25-7, Rurka Dec. ¶ 17).  Then, during a February 2, 2016 team meeting, Rurka instructed his team to wait to execute any data change records until after Smith completed certain necessary pre-work steps.  (Dkt. 25-1, p. 171; Plf. Dep. Ex. 17; Dkt. 25-7, Rurka Dec. ¶ 20).  Despite Rurka's instruction, Hunter executed a change record before Smith had completed his pre-work.  (Dkt. 25-1, pp. 167-72; Plf. Dep. Ex. 17; Dkt. 25-7, Rurka Dec. ¶ 21).  When Smith discovered what Hunter had done, he reported it to Rurka, who instructed Hunter to back out her changes.  (Dkt. 25-1, pp. 167-72; Plf. Dep. Ex. 16, 17; Dkt. 25-7, Rurka Dec. ¶ 22).  According to Rurka, if Smith had not discovered Hunter's actions, GM might have experienced data failures.  (Dkt. 25-7, Rurka Dec. ¶ 22).

After the above events, Rurka concluded that Hunter could not perform her job duties satisfactorily.  (Dkt. 25-7, Rurka Dec. ¶ 24).  Rurka and Andrzejewski conferred and recommended to Bruner that Hunter's repeated carelessness and disregard of procedures warranted termination.  (Dkt. 25-6, Andrzejewski Dec. ¶ 13).  Bruner agreed.  (Dkt. 25-6, Andrzejewski Dec. ¶ 13).  Andrzejewski presented the facts to Sharon Ridgell, a woman in GM's Policy Department. Ridgell agreed that termination was appropriate.  (Dkt. 25-6, Andrzejewski Dec. ¶ 14).  GM terminated Hunter's employment on February 18, 2016.  (Dkt. 25-1, pp. 100, 172; Plf. Dep. Ex. 18; Dkt. 25-6, Andrzejewski Dec. ¶ 15).  Shortly after

Hunter's termination, Rurka also recommended that Michael Pietersz, a man, be terminated for poor work performance. (Dkt. 25-7, Rurka Dec. ¶ 27).

Following her termination, Hunter made an "open-door" complaint and alleged that her termination was due to race and sex discrimination. (Dkt. 25-1, pp. 172- 73; Plf. Dep. Ex. 19). The investigator interviewed Hunter; reviewed Hunter's personnel records; and interviewed Rurka, Andrzejewski, and Hunter's coworkers. *Id*. at 174-75.; Plf. Dep. Ex. 21. The investigation resulted in a determination that Hunter's termination was appropriate and that her claims of discrimination could not be substantiated. *Id*. at 174-75; Plf. Dep. Ex. 21.

Hunter's discrimination and hostile work environment claims are based on the same alleged facts. (Dkt. 25-1, pp. 59-60). Hunter testified at her deposition that Rurka was the only GM employee who harassed and/or discriminated against her. *Id*. at 41, 60-61. Regarding her hostile work environment claim, Hunter claims that at a meeting in Summer 2014, Rurka teased her for having a crush on Director Richard Kahn, which Hunter denies. *Id*. at 61-64. Hunter claims Rurka continued to tease her. However, Hunter admits she never told Rurka to stop and she never reported Rurka's alleged teasing to Human Resources. *Id*. at 64-66. Hunter also contends that Rurka began treating her and another woman on the team, Melissa Bruce-Fuller differently than their male co-workers in mid-2014. Hunter points to allegations in the anonymous GM Awareline report that Rurka

called men "rockstars" but referred to the women on the team as "uneducated," "lazy" and "sloppy." (Dkt. 27-3, Ex. B). According to this anonymous report and Ms. Bruce-Fuller, Rurka would also ignore women on the team, talk down to them, exclude them from meetings, and walk away from them while they were speaking. *Id.*; Dkt. 27-4, Ex. C, deposition of Melissa Bruce-Fuller, p. 32. Arthur Gutowski testified that there were times when Hunter was not heard at meetings. (Dkt. 27-5, Ex. D, pp. 21-22).

Hunter asserts that Rurka harassed her by having a conversation with her about her personal hygiene in 2015. *Id*. at 67. She says that Rurka would not tell her who made the complaint, and no one would admit to Hunter that they had complained about her hygiene, so she assumed Rurka had made up the allegations. *Id*. at 68-71. However, Vosganian testified that one of Hunter's coworkers made the complaint to her. Hunter's open-door investigation confirmed that the coworker complained to Human Resources about Hunter's odor and appearance and that Bruner had directed Rurka to speak to Hunter about improving her hygiene. (Dkt. 25-1, p. 176; Plf. Dep. Ex. 21, p. 7; Dkt. 25-5, p. 63; Dkt. 25-3, pp. 67-68).

Hunter also claims that Rurka forced her to work while on medical leave. (Dkt. 25-1, pp. 75-76). Hunter broke her ankle in January 2014, but she did not obtain a doctor's note restricting her from working and she did not ask for time off.

*Id*. at 78-79.  Although Hunter believed her medication impacted her work, she did not tell Rurka about her belief.  *Id*. at 77-78; Dkt. 25-7, Rurka Dec. ¶ 26.

Hunter claims male coworkers could work from home two to three days per week. (Dkt. 25-1, p. 66).  Although Rurka allowed Hunter to work from home on occasion, he sent her a note in August 2015 telling her not to expect to work from home every Friday.  *Id*. at 81-83.  Rurka did not want Hunter to work from home on a recurring basis because he did not believe she was productive and attentive when she worked from home.  (Dkt. 25-1, pp. 83-84; Dkt. 25-3, pp. 54-55).  For example, Rurka observed that when Hunter worked from home, she was unavailable for large blocks of time, and the instant messenger status on her computer typically indicated that she was away from her computer, which he took to mean she was being unproductive.  (Dkt. 25-3, pp. 54-55, 65-66).  On the other hand, Rurka permitted others in the mainframe group to work from home.  For example, Garth Devlin worked from home, but he was located in Ireland.  (Dkt. 25-1, p. 84).  Hunter does not know whether Wes Harrell worked from home because he worked in Atlanta, Georgia.  *Id*.  Smith worked from home on occasion, but he was located in Austin, Texas and his commute was an hour long, whereas Hunter lived only 15 miles away from the Warren Technical Center. (Dkt. 25-1, pp. 84-85).  Mark Zaszczurynski was allowed to work from home on occasion because he had sinus problems.  (Dkt. 25-1, p. 85).  Unlike Hunter, Rurka

found Zaszczurynski and Smith to be productive when they worked at home. (Dkt. 25-7, Rurka Dec. ¶ 25).

Finally, Hunter claims she was retaliated against for complaining of discrimination. On September 30, 2015, an employee made an anonymous internal complaint via GM's Awareline that Rurka did not treat employees equally; Hunter admits that she did not make the complaint and neither Hunter nor GM is aware who did. (Dkt. 25-1, pp. 155-57; Plf. Dep. Ex. 13). But when Hunter was interviewed as a part of GM's investigation she alleged that Rurka had discriminated against her; Hunter cited as examples some of the information provided herein. *Id*. at 158-59. Don Stawiasz in Global Investigations investigated the allegations and determined "the allegations of discrimination and harassment are unsubstantiated." *Id*. at 155, 161; Plf. Dep. Ex. 13; Dkt. 25-4, Deposition of Don Stawiasz, pp. 5, 8.

## III.   ANALYSIS AND CONCLUSIONS

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that

the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S.

at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B.    Title VII and Elliott-Larsen Discrimination

Hunter alleges that she was discriminated against and discharged based on her gender in violation of Title VII and Elliott-Larsen.  The Sixth Circuit reviews claims of discrimination brought under the ELCRA under the same standards as claims brought under Title VII.  *Ladenberger v. Plymouth-Canton Cmty. Sch.*, 2018 WL 3914709, at *5 (E.D. Mich. Aug. 16, 2018) (citing *Idemudia v. J.P. Morgan Chase*, 434 Fed. Appx. 495, 499 (6th Cir. 2011)).  Absent direct evidence of discrimination, a plaintiff may rely on circumstantial evidence to establish a case of gender discrimination under the familiar burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  To establish a *prima facie* case for Title VII gender discrimination under that framework, plaintiff must show that: (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) that the job was given to a person outside the protected class or that she was treated differently than a similarly situated, non-protected employee.  *Abdulnour v. Campbell Soup Supply Co.,* 502 F.3d 496, 501-02 (6th Cir. 2007); *Lyons v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 416 Fed. Appx. 483 (6th Cir. 2011).  If a plaintiff establishes a *prima facie* case, the defendant can rebut it by articulating a

legitimate non-discriminatory reason for its action.  *Id.*  Thereafter, a plaintiff has the burden of showing, by a preponderance of the evidence, that the legitimate asserted reason was not the actual reason for the defendant's actions, but in fact was pretext for gender discrimination.  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  A plaintiff may establish that the defendant's proffered reasons is mere pretext by establishing that it: (1) has no basis in fact; (2) did not actually motivate plaintiff's termination; or (3) was insufficient to warrant plaintiff's termination.  *Abdulnour*, 502 F.3d at 502 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

GM argues that Hunter has not identified any other employee who was responsible for repeated major mistakes due to carelessness or disregard of GM's policies and procedures like she was and who was not terminated.  Rather, GM maintains that the opposite is true.  For example, following the tape deletion incident of September 2014, Rurka (a man) received the same discipline as Hunter; a written memo to the file.  In Rurka's case, the written memo significantly impacted his bonus that year.  Moreover, Beck, another man, was treated more harshly than Hunter because his contract was terminated; he was essentially fired because of this incident.  Finally, shortly after Hunter's termination, Rurka terminated another man, Michael Pietersz, for poor performance.  GM also asserts that Hunter engaged in similar carelessness and disregard for best practices again

in June 2015, August 2015, September 2015, November 2015, and February 2016.

Yet, Hunter does not claim any other employee engaged in similar conduct on

several occasions like she did and does not identify any other employee who made

such errors after being placed on a so-called last chance agreement.  Because

Hunter cannot identify anyone else who repeatedly engaged in such conduct and

remained employed, Gm insists her claim must fail.  *See Mensah v. Caruso*, 2014

U.S. Dist. LEXIS 2940 (E.D. Mich. Jan. 10, 2014) (holding plaintiff failed to

establish *prima facie* case because he could not identify a similarly situated

employee treated more favorably).

In response, Hunter does not address GM's arguments that she did not

establish a *prima facie* case because she does not identify any appropriate

comparators who were treated more favorably.  While Hunter acknowledges that

this is the appropriate legal standard here, she only argues that her performance-

based termination was a mere pretext and she was terminated due to her gender.

(Dkt. 27, pp. 20-21).  More specifically, Hunter contends:

> In this case, the stated basis for Plaintiff's
> termination had no basis in fact. As previously discussed,
> Plaintiff had no real performance issues. She was the
> highest performer on the team who was blamed for
> others' mistakes. As a result, to say that she was
> terminated due to performance issues is clearly pretext.
> Instead, the facts and evidence establish that Plaintiff was
> discriminated against, and terminated due to her
> sex/gender. Sam Rurka, her supervisor blatantly treated
> her differently than male employees. He refused to let her

work from home, he ignored her input, he would talk
down to her or just walk away when she was talking to
him, he would refer to the men who were less
knowledgeable than her as "rock stars". It is undisputed
that Plaintiff was a member of a protected class as a
woman. In addition, the record shows that she was
treated differently than other employees and that she was
treated less favorably due to her gender and Defendant's
Motion for Summary Judgment must be denied.

(Dkt. 27, p. 21).[3]

---

[3] The Court agrees with defendant that Rurka' refusal to allow plaintiff to work from home is not a sufficiently adverse employment action to support a discrimination claim. As explained in *Burgett v. Wilbur*, 2018 WL 4931928, at *4 (M.D. Tenn. Oct. 10, 2018), an adverse employment action must be <u>materially adverse</u> to support a discrimination claim:

> The Sixth Circuit has defined "adverse employment action" in a
> variety of employment discrimination cases. *See Gritton v.
> Disponett*, 2007 WL 3407459, at *6 (E.D. Ky. Nov. 14, 2007),
> aff'd, 332 Fed. Appx. 232 (6th Cir. 2009). In *White v. Burlington
> N. & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir. 2004), the court
> held that, to be adverse, an employment action must "constitute[] a
> significant change in employment status, such as hiring, firing,
> failing to promote, reassignment with significantly different
> responsibilities, or a decision causing a significant change in
> benefits." *Id.* at 798. A plaintiff must "show that []he suffered a
> materially adverse change in the terms of h[is] employment." *Id.* at
> 797 (internal quotation marks and citation omitted). However, "[a]
> mere inconvenience or an alteration of job responsibilities or a
> bruised ego is not enough to constitute an adverse employment
> action." *Id.* (internal quotation marks and citation omitted).
> Although "reassignments without salary or work hour changes do
> not ordinarily constitute adverse employment decisions," *Kocsis v.
> Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996), "[a]
> reassignment without salary or work hour changes...may be an
> adverse employment action if it constitutes a demotion evidenced
> by a less distinguished title, a material loss of benefits,
> significantly diminished material responsibilities, or other indices
> that might be unique to a particular situation." *White*, 364 F.3d at
> 797 (internal quotation marks and citation omitted).

Hunter misses the point, however. Before the Court can address pretext, plaintiff must establish her *prima facie* case. *Palmeri v. Goodwill Indus. of Middle Tennessee*, 2018 WL 4030571, at *11, n. 5 (M.D. Tenn. Aug. 23, 2018) (The issue of pretext should not be conflated with the fourth element of a *prima facie* case, where a plaintiff must typically show that her proposed comparators engaged in acts of "comparable seriousness."). Hunter does not claim that she has provided direct evidence of discrimination.[4] Rather, Hunter agrees that the *McDonnell-Douglas* burden-shifting framework is applicable and as such she must identify appropriate comparators. Yet, she merely asserts that she was treated differently than similarly situated men on her team by being blamed for their mistakes and was spoken down to. (Dkt. 27, p. 20). Under Sixth Circuit law, to establish that she was treated differently than similarly-situated employees more is required. Hunter must show that she and her proposed comparators were similar in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 353 (6th Cir. 1998). Even if considered appropriate comparators in terms of having

---

In the view of the Court, not permitting plaintiff to work from home is a mere inconvenience, rather than a material loss of benefits, a demotion, a less distinguished title, diminished material responsibilities or other similar materially adverse employment action.

[4] "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003). "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 548 (6th Cir. 2004).

similar enough jobs, when a termination is disciplinary in nature, a plaintiff must show that proposed comparators engaged in acts of "comparable seriousness." *Wright v. Murray Guard*, *Inc*., 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Clayton v. Meijer*, *Inc*., 281 F.3d 605, 611 (6th Cir. 2002)). To make this assessment, the court may look to several factors, such as whether the individuals "'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992)). However, when such factors are not relevant, the court need not consider them. *Id*. Rather, to determine whether two individuals are similarly situated regarding discipline, the court "make[s] an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee." *Id*.

While Hunter says she was blamed for the mistakes of men, and presumably, men were not blamed for the mistakes of women, she does not undertake the required comparator analysis when discipline is involved. Specifically, she does not identify anyone outside of her protected group who (1) made the same mistake(s) (or was deemed to have made the same mistake(s) by Rurka or others); (2) has a similar disciplinary history; and (3) was treated differently than she was.

Instead she identifies two "mistakes" by others for which she was blamed. The first involved the loss of data in September 2014. (Dkt. 27, pp. 4-6). Hunter maintains that she informed her boss and her team how GDGs worked but acknowledges that she did not stay for the after-hours meeting to address the issue. Hunter and Rurka were disciplined for this data loss, both having been found at fault during the investigation, and a contract employee was terminated. Hunter and Rurka each had a memo placed in their files and Rurka additionally lost part of his bonus. Hunter has not suggested that any of the other team members withdrew from the after-hours meeting to address the data issue; nor does she explain why she, having <u>not</u> attended the extended portion of the meeting, is similarly situated to those colleagues who received no discipline at all for the incident. Hunter also does not indicate whether her disciplinary history is the same as, similar to or different from any of her male colleagues who were not disciplined because of the data loss, such that differential treatment might be appropriate. *See e.g.*, *Williams v. Oakwood Healthcare, Inc.*, 2018 WL 4206975, at *9 (E.D. Mich. Sept. 4, 2018) (Although plaintiff and the comparator engaged in similar conduct, plaintiff had previously been suspended and the comparator had no disciplinary history.). Thus, on this record the Court cannot say that Hunter's co-workers who were not disciplined for the data loss are appropriate comparators. As to the second mistake by a male co-worker for which Hunter says she was blamed, she similalrly offers

no evidence suggesting that Mr. Diaz was either (1) not disciplined and therefore treated differently; or (2) Mr. Diaz had a similar disciplinary history as Hunter at the time of this incident. Thus, Mr. Diaz is also not an appropriate comparator, based on the record before the Court. Hunter does not appear to contend that any of the other disciplinary incidents in her record were either based on mistakes made by male colleagues for which she was blamed or that any appropriate comparator made similar mistakes and was treated differently.

Consequently, even viewing the evidence in the light most favorable to Hunter, she has not come forward with evidence creating a genuine issue of material fact that she was treated differently than any similarly situated co-workers. For this reason, GM is entitled to summary judgment on Hunter's Title VII and Elliott-Larsen discrimination/wrongful termination claims. Given that Hunter did not establish a *prima facie* case of discrimination, the Court need not address the parties' arguments regarding GM's claim that it had legitimate non-discriminatory reasons for terminating her or Hunter's arguments that the reasons offered were pretextual.

C.      Title VII and Elliott-Larsen Hostile Work Environment

Under the hostile work environment theory, in order to survive summary judgment, Hunter must establish that: (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on sex; (3)

the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Grace v. Uscar*, 521 F.3d 655, 678 (6th Cir. 2008) (citing *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996)). "The standards under Michigan's Elliott-Larsen Act are similar, except that an employer may be held liable for the creation of a hostile work environment only if it 'failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment.'" *Garner v. Gerber Collision & Glass*, 2017 WL 3642192, at *4 (E.D. Mich. Aug. 24, 2017) (quoting *Mathews v. Massage Green LLC*, 2016 WL 1242354, at *6 n. 4 (E.D. Mich. Mar. 30, 2016)) (quoting *Chambers v. Trettco, Inc.*, 463 Mich. 297 (2000)). Moreover, "[t]he harassment must meet both an objective and a subjective test, 'in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim.'" *Id*. (quoting *Randolph v. Ohio Dep't of Youth Svcs.*, 453 F.3d 724, 733 (6th Cir. 2006)). Factors to consider in determining whether a hostile work environment exists include, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 23 (1993) (emphasis omitted)). In addition, "courts must determine whether the 'workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Id.* at 678-679 (quoting *Harris*, at 21 (internal citations omitted)). Failure to establish a *prima facie* case is grounds to grant a defendant summary judgment. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). Once a hostile work environment is established, an employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of the harassment yet failed to take prompt and appropriate corrective action. *EEOC v. Harbert- Yeargin, Inc.,* 266 F.3d 498, 518 (6th Cir. 2001).

GM argues that Hunter's harassment claim fails because her allegations are not actionable and there is no evidence that the actions Hunter complains of now were based on her gender. She claims Rurka teased her about having a crush on Kahn. But, "simple teasing, … offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment. *Johnson v. Donahoe*, 642 Fed. Appx. 599, 612 (6th Cir. 2016); *see also Coles v. Dearborn Midwest Co*., 2015 U.S. Dist. LEXIS 42854, at *26-32 (E.D. Mich. Mar. 9, 2015) (dismissing plaintiff's harassment claim where offensive statements made on several occasions were not severe or pervasive enough to constitute a hostile work

environment). The same is true of Rurka's alleged teasing. GM also contends that Hunter's allegation that Rurka spoke to her about her hygiene is not evidence of sex harassment. Not only was this one-time conversation neither severe nor pervasive, there is no evidence that Rurka spoke to her because she was a woman. Rather, the evidence establishes that Rurka spoke to Hunter because a co-worker complained and Rurka followed Ms. Bruner's instruction to speak to Hunter.

Hunter contends, in contrast, that she was subjected to a hostile work environment daily. While she acknowledges that not being allowed to work from home standing alone may not be so severe to support the claim, Hunter argues that taken in the totality of the circumstances, with men being called "rock stars," women being ignored, talked down to, blamed for other's mistakes and excluded from meetings, not being allowed to work from home is just another in a long list of examples of how Hunter was subjected to a hostile work environment. Moreover, Hunter says that the discrimination and harassment actively interfered with her ability to do her job when her supervisor ignored her or failed to take her suggestions seriously. Ms. Bruce-Fuller testified at deposition that she and Hunter were excluded from meetings and prevented from doing their jobs. (Dkt. 27-4, Ex. C, Deposition of Melissa Bruce-Fuller, pp. 31-32). She also testified that Rurka's treatment interfered with her ability to do her job. (Dkt. 27-4, Ex. C, p. 33). Hunter also points to the September 24, 2014 tape deletion, when Rurka did not

listen to her, ordered the deletion of mainframe files, and then blamed Hunter because he did not know how to do his job. According to Hunter, the discrimination was so obvious co-workers felt obligated to go to Human Resources and Rurka to complain on her behalf. Hunter says that being ignored and made a scapegoat for male co-worker's mistakes is evidence of a hostile work environment.

The undersigned concludes that the alleged harassment described by Hunter was not sufficiently severe or pervasive. Hunter's belief that the harassment she suffered was because of her sex does not create an issue of fact. While it may satisfy the subjective prong of the hostile work environment test under *Harris v. Forklift Systems*, it does not, in and of itself, create a material issue of fact because Hunter must also satisfy the objective prong of that test, which requires an environment sufficiently severe or pervasive to create the type of environment that a reasonable person would find it to be hostile or abusive. While there is no magic number of incidents that must occur within a certain period, when comparing the conduct about which Hunter complains to the conduct alleged in cases within this Circuit where a hostile work environment was found to exist, Hunter's claim does not favorably compare.

For example, in *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007), the Sixth Circuit concluded that 15 incidents over a two-year period

was not sufficiently pervasive.  More particularly, the plaintiff alleged that her supervisors had prevented her from applying and obtaining certain job positions; adversely transferred her to an undesirable shift; assigned her job duties that she was not physically capable of performing and not qualified for, requiring very heavy lifting, ultimately leading to a groin injury; criticized her for eating during work, for leaving her work station to get a cup of coffee, for using the bathroom at the end of her break, and for the size of her earrings; assigned her tasks outside of her job description; falsely accused her of taking boxes while on company time; while she was on leave for the groin injury, someone cut the lock on her desk, removed supplies, and placed them in a box, although a white co-worker was able to store his supplies in a locked desk drawer; accused her, in front of other employees, of standing around on the job because she ate a doughnut while waiting for a coworker who asked for her assistance; criticized her for the route she took, but did not chastise her white co-workers who took the same route and had her timed to record how long it took her to get to her work station.  *Id*.  The incidents recounted in *Clay* were far more severe and pervasive than those identified by Hunter.  *See also Clay*, 501 F.3d at 708, comparing *Jordan v. City of Cleveland*, 464 F.3d 584, 598 (6th Cir. 2006) (conduct was sufficiently severe or pervasive when for over ten years plaintiff was exposed to racial slurs, demeaning jokes, and inflammatory graffiti, experienced "isolation and segregation" and "disparate

discipline and additional duties.") with *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-

85 (6th Cir.), cert. denied, 531 U.S. 928 (2000) (three sexually offensive remarks

made by the plaintiff's supervisor at the beginning and end of a six-month period

did not constitute pervasive discriminatory conduct). In contrast, the conduct

complained of by Hunter, viewed in the light most favorable to her, (male co-

workers being called rock stars, being ignored by her boss, excluded from

meetings, not being permitted to work from home, and being blamed twice for two

mistakes by male co-workers over a one-year period) is not sufficiently severe.

Furthermore, there is little evidence documenting the frequency and

pervasiveness of the conduct. The court in *E.E.O.C. v. Spitzer Mngt, Inc.*, 866

F.Supp.2d 851 (N.D. Ohio 2012) explained what is required for pervasiveness. In

*Spitzer*, Alawy Alawi complained that he was subject to a hostile work

environment based on his national origin. He asserted that he was subjected to

numerous comments from his general manager who called him "Ali Baba." *Id*. at

856. There was no question, in the mind of the court, that the slang term was used

based on Mr. Alawi's national origin. *Id*. However, the court concluded that the

EEOC and Mr. Alawi failed to come forward with sufficient evidence establishing

that the offending conduct was sufficiently frequent to meet the pervasiveness

standard. *Id*. at 857. Rather, Mr. Alawi only offered vague testimony regarding

the incidents and their frequency.  *Id.*  The court found this evidence insufficient to create a fact issue. [5]

In this case, while Hunter says she was subjected to a hostile work environment on a "daily basis," she does not present much evidence regarding the frequency of the complained of conduct.  Ms. Bruce-Miller testified that Rurka made inappropriate comments about the attractiveness of women on an "ongoing" basis.  (Dkt. 27-4, p. 18).  She also testified that Rurka did not listen to Hunter but could not think of any examples.  (Dkt. 27-4, p. 29).  Bruce-Miller also testified that she and Hunter were excluded from meetings but could provide no examples. *Id.* at 31.  She said he would "talk down" to her or Hunter as least once per week. *Id.*  She could not give any information about the frequency of Rurka refusing to accept an answer from a woman employee or walking away while a woman employee was talking.  *Id.* at 32.  Hunter also cites the tape deletion incident as evidence that Rurka did not listen to her, and that she was blamed for the mistakes

---

[5] In the context of gender discrimination, "non-sexual conduct may be illegally sex-based where it evinces anti-female animus," but even in the somewhat rare circumstances where that occurs the conduct must be severe and pervasive.  *Graves v. Dayton Gastroenterology Inc.*, 657 Fed. Appx. 485, 489 (6th Cir. 2016) (Court found that plaintiff's receipt of two sexually-oriented text messages from a co-worker, followed by the co-worker treating her rudely after she reported the texts: allegedly addressing her curtly, refusing to respond to her questions about work assignments, refusing to relieve her from her duties despite regularly relieving other employees, giving her the most difficult assignments, denying her lunch breaks on several occasions, throwing a chart at her, failing to provide her with updated work schedules, and denying her requests for days off was not based on her gender, but even if it was, it was not sufficiently pervasive).

of others. (Dkt. 27, p. 17). While Hunter says she was blamed for others' mistakes on several occasions, she cites only two incidents, as discussed above in detail, approximately one year apart. In the view of the Court, Hunter has not proffered sufficient evidence from which a jury could reasonably conclude that she was subjected to a pervasive hostile work environment on basis of sex.

Based on the forgoing, the Court concludes that the conduct alleged does not satisfy the objective prong of the hostile work environment standard on either severity or pervasiveness and thus, summary judgment in favor of GM on Hunter's hostile work environment claim is warranted.

D. Retaliation[6]

Title VII prohibits an employer from retaliating against an employee "because he has made a charge" of discrimination. *Charles v. MedTest DX*, *Inc*., 2018 WL 3997673, at *5 (E.D. Mich. Aug. 21, 2018) (citing 42 U.S.C. § 2000e-3(a)). The Elliott-Larsen statute includes a similar provision, *see* Mich. Comp. Laws § 37.2701(a), which is analyzed under the same standard. *Charles*, at *5 (citing *Kuhn v. Washtenaw Cty*., 709 F.3d 612, 627 (6th Cir. 2013)). A retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation."

---

[6] Hunter's complaint only contains a claim for retaliation under Elliott-Larsen, not Title VII.

*Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008). "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Id*. at 543-44 (citing *Abbott v. Crown Motor Co*., 348 F.3d 537, 542 (6th Cir. 2003); *Christopher v. Stouder Mem'l Hosp*., 936 F.2d 870, 879 (6th Cir. 1991)). Where, as here, the Hunter does not have direct evidence of retaliation and instead relies only on circumstantial evidence, the *McDonnell Douglas* framework applies. *Jordan*, 490 Fed. Appx. at 742. To establish a *prima facie* case of retaliation Hunter must establish that: (1) she engaged in a protected activity under Title VII; (2) her "exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys*., 2018 WL 3629057, at *8 (6th Cir. July 31, 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

GM contends that Hunter cannot establish her *prima facie* case because there is no causal connection between her complaint during GM's Awareline investigation and her termination. Hunter's termination in February 2016 occurred four months after her October 2015 interview with Stawiasz. GM maintains that this temporal remoteness is not sufficient to create a causal connection. *See Haji v.*

*Columbus City Schs.*, 621 Fed. Appx. 309, 313 (6th Cir. 2015) (quoting *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that [plaintiff was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation.").  GM also points out that, although Rurka recommended termination, Bruner (a woman) made the decision to terminate Hunter and Ridgell (a woman) reviewed and approved the termination decision.  According to GM, there is no evidence that Bruner and Ridgell had any discriminatory motives.

Hunter maintains that she engaged in the protected activity of meeting with an investigator with Human Resources and complaining of gender discrimination. GM and Rurka knew Hunter made these complaints and she says she was terminated because of the protected activity three months later.  According to Hunter, she was the highest performing member of her team.  (Dkt. 27-15, Ex. N). In addition, Hunter contends that her performance could not possibly have been the real reason for her termination because she had no performance issues.  *Id*.  Hunter also points out that on October 31, 2015, Rurka told the investigator that Hunter was a good employee who knew her job; yet, four months later, she was terminated.

In some instances, the temporal proximity between protected conduct and the adverse action is "enough to constitute evidence of a causal connection for the

purposes of satisfying a *prima facie* case of retaliation" but only if "an adverse...

action occurs very close in time after" the defendant learns of the protected

activity. *Shoults v. White*, 2018 WL 4761659, at *3 (W.D. Ky. Oct. 2, 2018)

(quoting *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008)).

The Sixth Circuit has held that a temporal proximity of "two to five months"

between protected conduct and adverse action is insufficient to satisfy the

causation element on its own. *Shoults*, at *3 (citing *Hafford v. Seidner*, 183 F.3d

506, 515 (6th Cir. 1999)). "But where some time elapses between when the

employer learns of a protected activity and the subsequent adverse employment

action, the employee must couple temporal proximity with other evidence of

retaliatory conduct to establish causality." *Garrett v. Mercedes-Benz Fin. Servs.*

*USA LLC*, 2018 WL 4358867, at *13 (E.D. Mich. Sept. 13, 2018) (quoting *Mickey*

*v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008)). In *Garrett*, the

plaintiff was able to survive summary judgment despite a sixth month gap between

the protected conduct and the adverse employment actions because she coupled

temporal proximity evidence with other evidence of retaliatory conduct. For

example, the plaintiff in *Garrett* showed that she had never received any discipline

or warning before the complaint and had previously had excellent performance

appraisals for 16 years before the complaint was made. The plaintiff's problems

did not begin until *after* she made her complaint. Indeed, in *Garrett*, all the

problems at issue occurred in the two years after the plaintiff first complained of gender discrimination, in the one year after the plaintiff initially complained of retaliation, and in the seven months after the plaintiff complained of retaliation a second time, which the court found buttressed the retaliation claim.

Here, Hunter does not offer evidence from which a reasonable jury could conclude that her termination was the result of retaliation. The record here evidences performance issues long before Hunter complained of discrimination, and while Rurka recommended dismissal, Bruner, a woman, made the decision to terminate Hunter and Ridgell, a woman, reviewed and approved the termination decision. Further, though plaintiff refers to Rurka as the "Pied Piper" of discipline, there is no reason to believe that Rurka's actions were the cat's paw in causing Hunter's termination, as the evidence shows that Bruner, who notably had personally participated in the investigation into the September 2014 tape deletion incident, desired plaintiff's termination well before it actually occurred and Rurka and Andrzejewski were the ones who had successfully lobbied for her retention.[7] In addition, Hunter does not contend that the mistakes she made in November 2015 or February 2016, after the last chance agreement was implemented, were not

---

[7] "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368 (6th Cir. 2017) (citations omitted).

based in fact, or that she was blamed for the actions of others on these occasions. The foregoing evidence undercuts, rather than supports, Hunter's claim of retaliation. Given that Hunter appears to be relying solely on the temporal proximity of her termination to her complaint, and that temporal proximity is insufficient to establish causation, her retaliation claim fails.

For the reasons set forth above, the Court **GRANTS** defendant's motion for summary judgment of plaintiff's sex-based claims. As indicated above, plaintiff has conceded her race-based claims and thus, they are dismissed. *See* note 1.

**IT IS SO ORDERED**.

Date: March 31, 2019
                                    s/Stephanie Dawkins Davis
                                    Stephanie Dawkins Davis
                                    United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on March 31, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                    s/Tammy Hallwood
                                    Case Manager
                                    (810) 341-7887
                                    tammy_hallwood@mied.uscourts.gov